```
             UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
```

**MOHAMMED I. RANAVAYA, M.D.,**

      Plaintiff

v.                                    CIVIL ACTION NO. 2:05-0109

**WORK LOSS DATA INSTITUTE, LLC,**

      Defendant

## MEMORANDUM OPINION AND ORDER

Pending are the motions (1) for summary judgment filed by defendant Work Loss Data Institute, LLC ("WLDI") on June 20, 2006, and (2) to exceed the page limitation filed by plaintiff Mohammed I. Ranavaya, M.D. ("Dr. Ranvaya") on July 5, 2006.

The court ORDERS that Dr. Ranavaya's motion to exceed the page limit be, and it hereby is, granted.

I.

Dr. Ranavaya, a West Virginia citizen, is a self-described, world-renowned expert in the field of work-related disability evaluation and treatment. (Compl. ¶ 2; Pl.'s Resp. at 1). He is a Professor of Occupational and Environmental Medicine

at the Marshall University School of Medicine, where he is chief of the Division of Occupational and Disability Medicine. (Dep. of Dr. Ranavaya at 3, ex. D, WLDI's Mot. Summ. J. ("Dr. Ranavaya Dep. at \_\_\_\_\_ ). Dr. Ranavaya also serves as the President of the American Board of Independent Medical Examiners ("ABIME") and as one of five associate editors for the upcoming sixth edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment. (Pl.'s dep. at 3-4, 18-19).

Phil Denniston and Patricia Whelan are the husband and wife principals of WLDI, a corporate citizen of both California and Texas. (Not. of Remov. ¶ 2; Dr. Ranavaya dep. at 19). WLDI publishes the Official Disability Guidelines ("ODG"), which compiles and reports disability duration and return to work data emanating from four federal databases. (Ex. B2 at 2, Pl.'s Resp.). In March 2001, Dr. Ranavaya met Denniston and Whelan at a worker's compensation meeting in Austin, Texas. (Dr. Ranavaya dep. at 19). Dr. Ranavaya advised Denniston and Whelan that he had previously parted ways with Pressley Reed, the publisher of an ODG competitor known as the Medical Disability Advisor (hereinafter "MDA"). (Pl.'s Resp. at 2). The three individuals then proceeded to explore the benefits of developing a working relationship. (Id.)

2

On that occasion, Dr. Ranavaya shared with Denniston and Whelan his idea for creating a new reference guide that combined the disability duration data contained in the ODG with evidence-based treatment protocols that reduce disability durations for approximately 200 conditions routinely seen in workers' compensation cases (hereinafter referred to as the "duration/treatment idea"). (Dr. Ranavaya dep. at 21-22). Pressley Reed had no interest in the duration/treatment idea but Denniston and Whelan were intrigued. (Id. at 22).

Following the Texas meeting, Dr. Ranavaya and Denniston discussed the duration/treatment idea via email. In an April 10, 2001, email to Denniston, Dr. Ranavaya stated "Phil, your understanding . . . of my concept of creating a nexus between internationally acclaimed expert advisory with the ODG data and your offer to meld expert advisory with the ODG data appears reasonable." (Ex. A7 at 1, Pl.'s Resp.). Dr. Ranavaya further stated as follows:

> Since the primary concept of this product is mine, I would like to retain the copyright to the product. To safeguard your interest I would be happy to consider a long term contract and other legal protective devices in the form of a contract with your company. We will have to find a mutually acceptable way to make it fair and equitable to both parties. I think these issues need to be resolved up front to prevent any kind of misunderstandings later on.

(Id. at 2).

3

The three parties made plans to discuss matters further in San Francisco on April 23, 2001. (Ex. A8 at 4, Pl.'s Resp.). Dr. Ranavaya contends as follows:

> Several potential partnerships were discussed in San Francisco – creating the new publication, adding text to the ODG to make it look more like the [Pressley] Reed product, adding Dr. Ranavaya as the Senior Medical Editor of the ODG and having Dr. Ranavaya sell ODG products at his various teaching assignments for a commission.

(Pl.'s Resp. at 3).

Two overriding issues surfaced in these early discussions. First, Denniston and Whelan believed a new publication based upon the duration/treatment idea, which they might not own or control, could ultimately "cannibalize" the ODG. (Ex. A9 at 7, Pl.'s Resp.). Second, Denniston and Whelan struggled with how to compensate Dr. Ranavaya for his efforts and yet protect the customer base and product they had built previously without his help. (Id.) Denniston, Whelan, and Dr. Ranavaya agreed to finalize the terms of their working relationship, if any, when Dr. Ranavaya returned the first week of July 2001 from international teaching assignments. (Id. at 9).

Upon Dr. Ranavaya's return, the parties scheduled a July 10, 2001, conference call to discuss terms. (Ex. A10 at 1,

4

Pl.'s Resp.).  On July 5, 2001, Denniston advised Dr. Ranavaya by email that WLDI declined adoption of a new product based upon the duration/treatment idea.  (Id.)  In that same email, however, Denniston offered the following incentives to Dr. Ranavaya if he joined forces with WLDI:

- According him the title of Senior Medical Editor of the ODG;

- Allowing his name alone to appear on the cover of ODG beginning with the 2002 edition;

- Permitting him to write the foreword to the ODG and the opportunity to thoroughly review the ODG "Best Practice" Guidelines; and

- Rewarding him with royalties of 20% of all sales of ODG to "new customer[s]."

(Id.)  A "new customer" was ultimately defined by the parties as "a sale where a new customer record is created in the WLDI subscriber system because that customer has not bought from WLDI in the past three years."  (Ex. A at 2, Def.'s Mot. Summ. J.).

Following the July 10, 2001, conference call, WLDI drafted a Partnership/Royalty Agreement ("Royalty Agreement") and transmitted it to Dr. Ranavaya. (Ex. A12 at 1, Pl.'s Resp.). Although the date is not apparent, a short time later WLDI drafted and sent Dr. Ranavaya a Confidentiality/Non-Disclosure Agreement ("Confidentiality Agreement").  (Ex. A14 at 1, Pl.'s Resp.).

5

During a July 29, 2001, conference call the parties apparently settled upon the language for both the Royalty Agreement and the Confidentiality Agreement. (Ex. A14 at 1, Pl.'s Resp.).  On August 6, 2001, Denniston executed the two agreements for WLDI.  On August 13, 2001, Dr. Ranavaya did likewise. (Exs. A and B, Def.'s Mot. Summ. J.).  A thumbnail sketch of both agreements is helpful in understanding the present controversy.

The Royalty Agreement ran for a one-year term, a period renewed automatically for successive terms "unless either party shall notify the other in writing 30 days prior to the new term of its intention not to renew the Agreement." (Ex. A  at 2, Def.'s Mot. Summ. J.).  In addition to this non-renewal provision, the Royalty Agreement also contains a separate cancellation provision, which states tersely as follows: "Either party may cancel this Agreement with 30 days notice to the other party."  (Id.)  If cancellation occurred, WLDI was obliged to pay Dr. Ranavaya "all royalties accrued on sales of the products prior to cancellation of the" Royalty Agreement.  (Id.)

The Confidentiality Agreement recognizes that WLDI and Dr. Ranavaya "agree to share strategic business and technical information related to software products and market strategy . .

. ."  (Ex. B at 1, Def.'s Mot. Summ. J.).  The Confidentiality Agreement protects, <u>inter</u> <u>alia</u>, "Business Information[,]" a term defined by the parties in their Confidentiality Agreement as "confidential or proprietary information belonging to or in the possession of [Dr. Ranavaya] or WLDI . . . that is not generally known to the public . . . ."  (<u>Id.</u>)  Additionally, the final paragraph of the Confidentiality Agreement provides as follows:

> Either party may terminate this [Confidentiality] Agreement without cause with thirty (30) days prior written notice to the other party in conjunction with termination of the separate  . . . Royalty Agreement between WLDI and [Dr. Ranavaya].  It is understood that while the . . . [Royalty] Agreement is actively in force between the two parties this . . . [Confidentiality] Agreement is valid and enforceable.  Termination of this [Confidentiality] Agreement for any reason does not affect the validity or enforceability of the [sic] Section 2 [relating, <u>inter</u> <u>alia</u>, to duties of confidentiality as to Business Information] and Section 3.1 [relating to remedies in the event of breach] inclusive [sic].

(<u>Id.</u> at 3).

Immediately after the two agreements were executed, the parties began performing their respective obligations.  Indeed, WLDI praised Dr. Ranavaya's efforts along the way.  (<u>See</u>, <u>e.g.</u>, (Ex. A16 at 1, Pl.'s Resp. (Whelan stating in a September 18, 2001, email that Dr. Ranavaya had "made great strides in securing the participation of key new members to our board" and that his "reach . . . [was] impressive . . . from Ohio to New Zealand and South Africa!").

7

Dr. Ranavaya contends, however, that the parties' relationship began to sour at about the time West Virginia started reviewing disability guidelines, expressing more interest in the competing MDA rather than the ODG.  (Pl.'s Resp. at 8). It appears the competition between the MDA and ODG began in West Virginia sometime in September 2002 based upon a review of the parties' exhibits.  (See, e.g., Ex. A23 at 2, Pl.'s Resp.).  In October of 2002, a WLDI account executive, Phil LeFevre, learned that the MDA would be chosen in West Virginia over the ODG.  (Ex. A24 at 1, Pl.'s Resp.).  In an October 22, 2002, email to Dr. Ranavaya, LeFevre stated as follows:

> Reed likes to cram his contract down one's throat quickly and quietly, and I am afraid if we do not act immediately we will lose this important State fund, and they will make a major, costly mistake in licensing a stagnant, nebulous, obsolete, overpriced textbook from Reed . . . .
>
> I do not know how, but Presley [sic] Reed seems to have clout in WV.  We also have clout in WV with our most prestigious Senior Medical Editor [Dr. Ranavaya].  I hope that you have an impact on this situation.

(Id.)

On December 23, 2002, Denniston wrote to the Purchasing Director for the State of West Virginia and threatened to protest any award of an annual licensing contract to Pressley Reed.  (Ex. A25 at 1, Pl.'s Resp.).  On January 27, 2003, LeFevre again

sought Dr. Ranavaya's assistance on the matter, requesting that he obtain a copy of state purchasing regulations for WLDI.  (Ex. A26 at 1, Pl.'s Resp.).  Lefevre additionally inquired as to whether Dr. Ranavaya would use, if he had one, his vendor identification number to protest any award to Pressley Reed on behalf of WLDI.  (Id.)  Although the date is not apparent from the record, Dr. Ranavaya advised WLDI that he was forced to decline its request because he believed his involvement would place him in a conflict-of-interest situation.[1]  (Ranavaya Dep. at 11).

On May 29, 2003, Denniston wrote Dr. Ranavaya. Inasmuch as it occupies a central role in this case, the letter is reproduced in its entirety:

> Shortly you will be receiving a draft copy of a new publication from WLDI, *ODG Treatment in Workers Compensation* ["ODG-TWC"], (First Edition, 2003).  As you know, Bud Kennedy has been the senior medical editor for this publication.  Much of the work Bud did started 2-1/2 years ago when he approached us as a member of the AOS Guidelines Committee.  I included you as part of the Editorial Advisory Board for ODG-TWC.  I hope we can also count on your help with this major new effort from WLDI.
>
> As we are about to end the second year of our Agreement with respect to *Official Disability Guidelines*, we should probably pause and take stock on where we are and evaluate to what extent this

---

[1]The potential conflict arose as a result of Dr. Ranavaya's service at that time as a consultant to the West Virginia worker's compensation system.

> partnership has fulfilled the objectives of each party. Pat and I have really enjoyed working with you and have considerable respect for your abilities, and I hope we can structure a new agreement going forward.  I also have to be honest about some disappointment concerning new business opportunities, and of course the loss of West Virginia.  I have to tell you that we have lost some other business because of hard feelings in the ABIME versus AADEP rift, to such an extent as to have forced us to re-examine the value-added benefit of giving selective prominence to one medical editor on the cover of the book over our active, contributing board members in general.
>
> Going forward I would like to see you benefit from your efforts, for example Swiss Re and others, including West Virginia. (I have been in touch with Greg Burton, the new Commissioner in West Virginia, and there may be hope for us yet.)  If either one of those becomes the $25,000+ annual client that they should, then I am happy to see you have a one-fifth interest in that for every year going forward as well as from any new relationships you generate for us.  I would also like to include you as a member of the Editorial Advisory Board for future editions of *Official Disability Guidelines*.
>
> Please let me know your thoughts and ideas on this.

(Ex. A28 at 1, Pl.'s Resp.).

WLDI contends the May 29, 2003, notice was a "cancellation letter to [Dr.] Ranavaya expressing WLDI's intention not to renew the Royalty Agreement and Confidentiality Agreement with him, but promising to pay royalty commissions on specific future new business that was named and agreed upon in advance."  (Def.'s Memo. in Supp. at 4).

Dr. Ranavaya contends that after receipt of this letter, he was "cut . . . out of the partnership." (Pl.'s Resp. at 9). He was, namely, (1) removed as Senior Medical Editor of the ODG, (2) his name and credentials were removed from the spine and cover of the ODG, (3) Whelan commenced writing the Foreword for future ODG editions, (4) he was not asked to provide any further editorial comments about the ODG, and (5) "royalty payments that had been routine before the May 29, 2003 letter, became sporadic and were made only after Dr. Ranavaya inquired about the payments." (Id.) Dr. Ranavaya contends WLDI punished him as a result of his failure to intervene in the West Virginia competition between Pressley Reed and WLDI. (Dr. Ranavaya Dep. at 15). The royalty payments eventually ceased. (Pl.'s Resp. at 9).

Dr. Ranavaya was troubled as well by Denniston's May 29, 2003, reference to the new "ODG-TWC[,]" published in cooperation with Dr. Charles Kennedy. (Pl.'s Resp. at 9). Dr. Ranavaya contends the ODG-TWC is substantially the same as the duration/treatment idea that he initially suggested to Denniston and Whelan during their formative meetings in 2001. The ODG-TWC has met with some success, with gross sales exceeding $1,850,000.00 to date. Dr. Ranavaya additionally contends the

ODG-TWC cannibalizes the ODG, a reason Denniston gave for not pursuing Dr. Ranavaya's duration/treatment idea in May 2001.

On September 20, 2004, Dr. Ranavaya instituted this action in the Circuit Court of Logan County. (Not. of Remov. ¶ 10). The complaint contains three claims. First, Dr. Ranavaya alleges in Count I a breach of contract claim relating to the Royalty Agreement. He asserts that WLDI (1) failed to put his name on the spine of the ODG as promised, and (2) neglected to pay royalties properly due him. (Compl. ¶¶ 48-52). Count II alleges a breach of contract claim relating to the Confidentiality Agreement. In that claim Dr. Ranavaya contends WLDI made unauthorized use of his duration/treatment idea in the ODG-TWC. (Id. ¶¶ 53-56). Count III is a conversion claim based upon the same ODG-TWC predicate found in Count II. On February 9, 2005, WLDI removed pursuant to 28 U.S.C. §§ 1332(a)(1) and 1441(a).

II.

A. Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a

verdict in favor of the non-moving party. <u>Anderson</u>, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. <u>Overstreet v. Kentucky Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

Regarding contract cases specifically, our court of appeals has observed that the matter of "interpretation is a subject particularly suited for summary judgment . . . ." <u>Bank of Montreal v. Signet Bank</u>, 193 F.3d 818, 835 (4th Cir. 1999). It has also been observed repeatedly, however, that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of

14

material fact . . . [and] summary judgment is inappropriate."

<u>Sempione v. Provident Bank</u>, 75 F.3d 951, 959 (4th Cir. 1996).

The court of appeals has further noted:

> "Only an unambiguous writing justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' . . . <u>If there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact</u>." 605 F.2d at 726.

<u>Atalla v. Abdul-Baki</u>, 976 F.2d 189, 192 (4th Cir. 1992) (emphasis added) (quoting <u>Bear Brand Hosiery Co. v. Tights, Inc.</u>, 605 F.2d 723, 726 (4th Cir. 1979) (quoting <u>American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co.</u>, 354 F.2d 214, 216 (4th Cir. 1965)).

Expanding upon this analysis, the court of appeals has stated:

> [W]here a court . . . determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. <u>See</u> <u>Jaftex Corp. v. Aetna Casualty and Surety Co.</u>, 617 F.2d 1062, 1063 (4th Cir. 1980). If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact. <u>World-Wide Rights Ltd. Partnership v. Combe Inc.</u>, 955 F.2d 242, 245 (4th Cir. 1992).

<u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1126 (4th Cir. 1993).

**B.   Analysis**

In moving for summary judgment, WLDI asserts several arguments seeking dismissal of Dr. Ranavaya's claims.  Regarding Count I, WLDI contends first that there has been no breach of the Royalty Agreement because that accord was effectively cancelled by Denniston's May 29, 2003, letter to Dr. Ranavaya.  (Def.'s Memo. in Supp. at 5-6).  The Royalty Agreement does not define the term "cancel."  Dr. Ranavaya contends the equivocal nature of the May 29, 2003, letter does not justify judgment as a matter of law in WLDI's favor.  The court agrees.

Dr. Ranavaya appears to understand the word "cancel[,]" as used in the Royalty Agreement, to mean something more than the language employed in the May 29, 2003, letter.  WLDI believes the May 29, 2003, letter was sufficient to end the parties' relationship.  This fundamental disagreement concerning the proper ingredients of an effective cancellation notice under the Royalty Agreement create a triable issue of fact.

Beyond this observation though, the jury's role is apparent in resolving the adequacy of a notice required by a contract.  One respected legal encyclopedia illustrates the point:

16

> Commonly understood, the function of notice is to provide forewarning of an event. . . .  [A] person is deemed to have notice when he or she has actual knowledge or when, <u>from all known facts and circumstances at the time in question, he or she has reason to know that it exists</u>.
>
> A person has notice of a fact only when it is actually communicated to the person <u>in such a way that his or her mind can and does take cognizance of it</u>. The essence of notice, when it is sufficient in form and content, <u>is its objective effect on the person to whom it is given</u>, not the subjective intent of the person who gives it.

58 Am. Jur. 2d Notice § 2 (2006) (emphasis supplied).

Aside from the adequacy of the May 29, 2003, letter, WLDI contends that the parties' conduct subsequent to that date strongly indicates Dr. Ranavaya understood the Royalty Agreement and Confidentiality Agreement to have been cancelled.  The parties conflict, however, on the occurrence, much less the meaning, of those subsequent events.  For instance, WLDI contends that on June 9, 2003, the parties met via conference call, at which time Dr. Ranavaya expressed his disappointment concerning the termination of the contract.  (<u>Id.</u> at 7).  Dr. Ranavaya denies, however, that he was told during the conversation that the Royalty Agreement was terminated or cancelled, implicitly denying as well that he expressed any disappointment in that regard.  (Ranavaya dep. at 46).  The content and significance of these subsequent events will necessarily involve a jury.

17

Regarding Counts II and III, WLDI notes Dr. Kennedy's testimony that he began work on ODG-TWC in late 2000 or early 2001, before Dr. Ranavaya had any contact with WLDI. (Id. at 10). WLDI also asserts (1) the duration/treatment idea was "well known within the field[,]" (Def.'s Memo. in Supp. at 10); and (2) the concept behind ODG-TWC is, according to Denniston and Dr. Kennedy, "completely different[,]" (Dep. of Phil Denniston at 163-64) from Dr. Ranavaya's duration/treatment idea. (Id. at 11-13).[2]

Dr. Ranavaya responds, inter alia, that (1) he pitched the duration/treatment idea to WLDI before Denniston and Dr. Kennedy began work on their new publication, (2) had WLDI already begun work on a publication involving the duration/treatment idea, Denniston would surely have made that fact known to Dr. Ranavaya when he proposed the idea in 2001, (3) neither WLDI nor Dr. Kennedy have produced documentation showing when they first

---

[2]WLDI also contends Dr. Ranavaya has not raised a genuine issue of material fact on the question of damages. In addition to other damage issues that raise genuine issues of material fact, the court observes that if the May 29, 2003, communication was defective as a notice of cancellation, questions arise as to whether royalty payments were properly made thereafter. Further, if there truly was a breach of the Confidentiality Agreement, some damages will surely arise. It will, however, be incumbent upon Dr. Ranavaya to prove any damages sustained by a preponderance of the evidence.

started work on the ODG-TWC, (4) emails from Denniston to Dr. Ranavaya in March 2001 illustrate the sender's understanding that the duration/treatment idea was novel, and (5) the foreword to the ODG-TWC touts it as a unique publication.  These types of genuine and material factual disputes require consideration and resolution by a trier of fact.[3]

### III.

Based upon the foregoing, the court ORDERS that WLDI's motion for summary judgment be, and it hereby is, denied.

---

[3] WLDI also raises a number of matters in reply that are not properly joined for a ruling.  For instance, WLDI contends that, following the May 29, 2003, letter, "a new agreement was structured wherein [Dr.] Ranavaya was/is to receive twenty percent (20%) of new relationships generated and twenty-five percent (25%) of certain named accounts."  (Id.)  The court has not located any exhibit attached to the reply brief that supports the assertion.  Further, WLDI requests that the court "rule, as a matter of law, that [Dr.] Ranavaya was entitled to royalties only upon proceeds from first time buyers and no buyers who purchased within the prior three years."  (Def.'s Reply at 6).  The court declines to reach these and other late-coming issues inasmuch as both parties have not had the opportunity to fully brief the matters.  Judgment as a matter of law would be inappropriate under such circumstances.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: August 24, 2006

John T. Copenhaver, Jr.
United States District Judge